We'll call our first case, Stemtech, Leonard v. Stemtech. Ms. Carter. Good morning, Your Honors. May it please the Court, my name is Kathy Carter and I represent Stemtech International Inc., formerly known as Stemtech Health Sciences Inc. With the Court's permission, I would like to reserve three minutes for rebuttal. It's fine. Thank you, Your Honors. Adhering to this Court's decision in Cortez, this Court has a mandatory duty to reduce the award as a matter of law to an amount that conforms to due process. The award in this case is constitutionally excessive for at least four reasons. Are you giving up a liability or starting off with the award or are you arguing liability? I am arguing liability as well, sir. I was actually going to go in reverse order, Your Honor. Well, that's fine. Okay. Questioning that now, but four reasons. First, it included impermissible multipliers not provided for under the law. Let's talk about the multipliers. The multipliers, as described in the record, were for scarcity and exclusiveness. They weren't punishment, according to the testimony. There was also no objection in the doubt to the Daubert stage or at trial to the use of multipliers. So how can you be heard on this subject at this stage? Didn't you waive that? No, Your Honor. I don't believe that that was waived because we objected to the basis of, we objected to Professor Sedlick providing any of his opinions on damages. But did you specifically argue on the multiplier issue? And if so, where? I don't think we specifically argued that component in the Daubert motion. So then why isn't that waived? It isn't waived because the award is contrary to law, and we did make a motion for a new trial and include that as a basis. And so why is exclusivity? We'll assume for the purposes of this question that it's not waived. Why is the use of an enhancement of this sort to deal with scarcity and exclusivity improper under the copyright law, which allows only for actual damages, where the explanation for it was based on the nature of the images themselves? I think it's for two reasons in particular. The first, and probably the most compelling reason, is that the only witnesses that testified relative to multipliers at trial were the plaintiff's expert, Professor Sedlick, and Mr. Gerard of Photo Researchers. And both of those individuals, including Professor Sedlick, who testified to the multipliers, testified that the amount a willing buyer would have been reasonably required to pay a willing seller at the time of the original, of the pre-infringement, I should say, for the actual use made, would include already within that number adjustments for scarcity or exclusivity. You know what's interesting here, though? I mean, the verdict was really, to understand it, it was eye-popping. It was extraordinary. $1.6 million for a number of images that were repeated by distributors. But I also found interesting that you didn't bother to bring an expert to challenge the expert that was called by the other side. That was, I take, a strategic decision. Yes, it was an intentional decision. But the problem is that you're left with an expert who was unchallenged. As to exclusivity, as to scarcity, as to the total amount that the plaintiff was entitled to. And the jury's number was within the parameters, the only expert the jury heard from. That's correct. It was within the parameters of the expert's testimony. Two issues on why we didn't provide a competing expert. First, it was our position, as per the Daubert motion as well, that this was not an appropriate issue for expert testimony. Because there was 16 years of an actual licensing history for Mr. Leonard that could be admitted into evidence, and then even in opposition to our Daubert motion, the plaintiff submitted that it's basically third-grade math after that. You're taking the images, you're taking the actual amount a willing buyer would pay, and you're multiplying. So expert opinion on that topic, it's not outside the ordinary knowledge of the average person to multiply. Well, that was a risk you took. It was a risk we took. Yes, it was. So just the average person would know what these slides would be worth? Based upon the evidence, yes. Because Mr. Leonard licensed them 92 times over 16 years. And gave specific quotes to STEMTAC for specific uses, pre-infringement for his own work. But that's only one theory of damages, which is past licensing history. The other permissible theory under the case was fair market value. And I put it to Judge Restrepo's question, how could a jury know what the fair market value would be? Because the fair market value actually is what a willing buyer could reasonably be expected to pay a willing seller. And licensing history would be the evidence of that. What do you do when the jury simply rejects that? The jury adopted the expert's testimony concerning the scarcity, the difficulty in making these photographs in the first instance, requiring very special equipment of a very unique product, and bought that testimony. How do we tell the district judge, you got it wrong, you should have set aside that verdict? Because that testimony is actually incompatible with the actual damage standard that is permitted for recovery on these cases. Professor Sedlick's testimony, for example. What standard is that? It is what a willing buyer would have been reasonably required to pay a willing seller at the time of the infringement for the actual use that was made. So, what a willing buyer would pay really is not dictated by how long it took to create the images. It is what a willing buyer would pay a willing seller. The problem, it seems to me, the problem is that the expert himself was a photographer who apparently also worked with unique images. And apparently was very well qualified before the jury and testified before the jury regarding the scarcity of this type of photograph, the exclusivity, did the math for the jury in front of the jury and came up with a figure of 1.6, I think it was 1.6. Yes. Done. Just did the math for the jury and the jury accepted him in terms of his qualification, in terms of his knowledge, in terms of his credibility? Yes, they did. And now you're asking us to set that aside. Well, Professor Sedlak also testified that all of the uses put before the jury in this case, all 92 of the alleged infringements could be licensed for $17,000. So, is it a rational relation to say that a willing buyer would pay $1.6 million for these licenses? Well, what do we do when the jury accepts the expert's testimony and rejects the testimony? I think the issue for the court is whether that expert's testimony is reliable and based upon the evidence that was fixed. Is that the standard, or is it whether or not it shocks the judicial conscience? For a constitutionally excessive award, it is whether it conforms to due process. And the multipliers, back to Judge Schwartz, your question, the multipliers, all of the courts that have looked at multipliers have found them not to be a permissible measure of damages. Even Grant-Hillman, where they were. But in one case, multipliers were contemplated by contract. In another case, it might have been the case that Mr. Sedlak testified in, I'm not 100% sure. The multiplier was for causal litigation, which the court appropriately said that's covered by a different statutory provision. And some other component that would have factored into fair market value. And so I'm not sure that we have a case out there. And if we have one, I'd be glad to be directed to it that says, multipliers that focus on things dealing with the image itself or the object being infringed, you cannot, that it's improper to give a premium for exclusivity or scarcity. I am not aware of any case out there that specifically addresses that. Okay. And let me flip it a little bit. What if what the expert had done would say, within its own calculation of fair market value, just add the premium and then multiply it times the number of images? That would be a permissible verdict, correct? That would be a permissible damage award, correct? If there was a foundation for a willing buyer actually reasonably being required to pay that to a willing seller. So Professor Sedlak's testimony started with what I believe is even an improper damage measure, which is quotes on the Internet for stock photography. Let's stay focused on the multipliers, though, if we could. Because I understand your position concerning that from your submission. On the multiplier, though, where in the record is there a challenge to the basis for that figure through the cross-examination at trial? Is there any questions that were ever levied in his direction that question the foundation for those ranges? No, I don't believe there was cross-exam on the ranges he gave for multipliers. My cross-examination was focused more on demonstrating a lack of foundation for the $215,000 base licensing fee that Professor Sedlak even started with. And I suppose I should actually correct myself. I believe it was on cross-exam, it may have been on direct, but I believe it was cross where Professor Sedlak actually testified that the scarcity and exclusivity are actually included in those stock photography quotes. So multiplying afterward is actually adding a multiplier by whatever name you put on it. I mean, to call it something different really just tries to take the multipliers that have been found permissible in district courts across the country and turn it into something that's permissible. And Grant Howman even found, even where the parties contracted for it, the court didn't allow it except in the instances where the plaintiff could prove the defendant had actually paid it. In this case, there was no Rule 50 motion. Argued or filed, correct? That's correct. So it's a Rule 59 matrix we've got here. Correct. You cite a Ninth Circuit employment case as the appropriate standard of review. How do you reconcile that? For the standard of review, I'm sorry. How much deference do we give the district court? For constitutionally excessive, your review's de novo. And what about for the liability issues? For the liability issues, the standard of review, I believe, is substantial evidence. Is that what it is under Rule 59? I believe so, Your Honor. The district court rejected a request for prejudgment interest? Yes, Your Honor. It's common to grant those types of requests. Why was it granted in this case? In this case, the court granted or did not grant the motion for prejudgment interest. It appears based upon determinations that, based upon the evidence and the award, that the plaintiff had been compensated sufficiently. Okay. We'll get you back on your boat. Thank you, Your Honor. Mr. Burlage? Good morning, Your Honors. Good morning. If it may please the Court, my name is Jan Burlage. I represent the appellee, the cross-appellant, Andrew Leonard. Your Honors requested that we focus on three issues. One, vicarious infringement. Two, contributory infringement. And three, damages. What's the standard review on damages? Well, there are actually three damages at issue in this case, actual damages, additional profits, and prejudgment interest. If we are talking about the jury's award of the actual damages, it's abuse of discretion, and we cite to those cases in our brief. With respect to the first two issues, vicarious and contributory infringement, there can be no doubt in this case that the jury found in favor of Mr. Leonard on each necessary element. The jury was required to fill out a special jury verdict form that appellants provided, they did, and they answered in Mr. Leonard's favor as to every single question. Were there any objections to the verdict form? I don't believe there was, Your Honor. Is that a no? There were no objections. No, I don't believe that there were. As Judge Stark, the presiding trial judge, observed in denying appellants' motion for a new trial under Rule 29, there was more than sufficient evidence to support the jury's findings in this case. Can we move to the damages subject for a little bit? Absolutely, Your Honor. I'm sorry, I was talking about how do you respond to the argument that scarcity and exclusivity should be considered within the fair market value as opposed to an add-on or a premium? I'll use the word premium rather than multiplier. Yes, Judge Schwartz. First, and I'd like to focus on what Professor Sedlick was looking at, he was just looking at general photographs that you would find online. When we're talking about Mr. Leonard's images, we're not talking about normal photographs. So what he did is he said, okay, what do similar photographs show for? And remember that when you come to Andrew Leonard's, he has sold his photographs for as much as $6,000, $4,500. So these are not typical photographs. But what Sedlick is looking at is typical photographs. That's where he comes up to the $215,000 and change base number. Then he has to say, look, I've used these numbers. Now I need to take these numbers and put them in the actual context that we're in, where we're dealing with very, very special photographs. And that's where he gets the scarcity component, the rarity. And not only did you have Professor Sedlick's testimony, and Professor Sedlick canvassed the universe, you also had Mr. Duraro, who is in the business of buying and selling photographs, who talked about it, and we put it in detail in our brief, his comments about where these were, how beautiful they were. Because at the time, there really are no stem cell pictures out there. Well, you have been licensing these same photographs for several years. Yes, but here's the thing. These photographs take on a whole new nature when Time magazine puts them on their front cover. Well, I mean, does he charge a different licensing fee, depending on whether it's on the front cover or in the middle of the magazine? He does. Well, more specifically, it depends on the use. If it is for a newspaper, education, he charges a much lower rate. The rates that the appellate keeps looking to are those rates that Mr. Leonard charged for educational and news purposes, not what he charged when he was selling his photographs to pharmaceutical companies like Baxter and others, which he would then charge a much higher rate for. But in any event, to answer Judge Horst's question, the scary element of this was because these are not just any ordinary photographs. Then he looked at the amounts of use. And the amount of use here isn't just one time in one magazine. It isn't just one time on one website. As Brian Noor, the security officer of appellants, noted, these went viral. And his position was once something goes viral, you don't even need to bother to try and police it. Were you able to estimate for the jury the number of uses? I'm sorry? Were you able to determine for the jury the number of uses? We were able to determine the number of uses that we found, which I believe exceeded over 90. It may have even been more than that. Those uses continue today. In fact, we have a case pending in the Western District of Pennsylvania on not the images at issue here, but other images. The trial court at the time, because we needed to have a deadline, provided a deadline as to when we could put in photographs. Because even at the time of trial, you could still go on the Internet and see Mr. Leonard's images on certain distributors' websites. I'm told that the verdict in this case by far exceeds the 92 previous licenses that were obtained for Mr. Leonard over a 15-year period. And again, I believe that appellant... Doesn't that make this verdict excessive? No, Your Honor. This is, again, the use here was all-inclusive. This basically became the trademark for the appellant. Now when people see Mr. Leonard's images, they associate it with STEM tech and STEM Enhance. Moreover, the trial court specifically looked at these issues on the Rule 59 motion. These aren't new arguments today. They were addressed by Judge Stark specifically. As this court has noted, when a trial court denies a Rule 59 motion based on the weight of evidence, that determination, and I quote, is virtually unassailable on appeal. But your adversary is talking about, for the damages award, that as a matter of law, using the multipliers rendered this unconstitutional, presumably because Section 504 only allows actual damages, not punitive or punishment damages. And so that's the point that I'd like to hear from you about is why this doesn't fall into that category and where we know that, at least in a different case, Mr. Sedlik said that multipliers should not be used. Right, and that was in terms of whether they were being used to penalize the defendant. That was not what was done here. What was done here, as the magistrate explains in his opinion, denying the Daubert motion, as the trial court mentions in his motion denying the new trial, was that we were trying to get a very unique image with a wide use on the Internet where it had gone viral and trying to put a dollar value on that. And what Professor Sedlik did was he put a dollar value on that. And it was in a range. I mean, the high end of that range is $2.9 million. This isn't just the jury saying, oh, there's an expert, let's do what the expert says. They deliberate and they're very conscious and they pick something in the middle range. And where is the appellant's expert to contradict this? They provide no contradictory evidence that the jury could come to look at. They had an absolute, every opportunity to cross-examine Professor Sedlik. And they did. And you heard today, they didn't bother to cross him on these multipliers. I don't see how they can now, after the jury has issued this verdict, this case has been going on eight years, come back and say, well, we want to have the jury verdicts overdone. That jury verdict was well within the range of Professor Sedlik's testimony and the range that he gave was rational, reasonable, and supported by the weight of the evidence and affirmed by the trial court, who was actually sitting at the trial and witnessed everything firsthand. What about the prejudgment interest ruling? Is there any problem with the fact that part of the reason why it was denied was essentially a perspective that sufficient compensation was already made? Is it a jury verdict? Yes, Your Honor. There's case law out of the Supreme Court and out of this circuit. In the case of Booker v. Taylor Milk Company, 64F 3rd, 860, 868 through 869, which is a 1995 case where the court says that kind of equitable balancing is inappropriate. Moreover, I would point, Your Honors, to William A. Graham Company v. Hagee, and there's two cases. One of them deals with the reasonable jury standard, which I'll get into when we're talking about additional profits, but there's also a written opinion in that case dealing with prejudgment interest. There's a case, and that's at 646F 3rd, 138. As the Graham Court states in that case, prejudgment interest is a separate component and a necessary component, and the standard here is really that prejudgment interest will be awarded unless the plaintiff has intentionally tried to delay the proceedings to get the prejudgment interest greater. Is the standard the abusive discretion standard? It is, Your Honor, but in this case you have case law directly on point that's saying the court's reasoning that Mr. Leonard had been given enough is not a proper grounds for denying prejudgment interest. But it's clearly brought to the judge's discretion. The judge who heard the trial heard the evidence. Understood. And noted that the verdict was quite substantial. Understood, Your Honor. The judge can take that into account as well. No, he can't, not under the case law that I cite. You can't say that. I'm sorry, Your Honor. Go ahead, finish. I was just going to say the case law says that that's not a proper consideration. The case law is very clear that there is a strong, strong preference in favor of prejudgment interest and that it is to be given unless the plaintiff has intentionally delayed the proceedings. And the case law in the Supreme Court cases that we cite in our brief are very clear. You can't say, well, he's got enough, we're not going to award it. And again, here the jury's award is for actual damages at the time the appellant started to entrench. So it's what they would have paid at that time. So prejudgment interest is just simply the time value added of money. I'd like to ask you a question about control that the judge was trying to provide. I was going to ask you about actual damages. And the verdict sheet makes it clear as I read it, this was just an actual damages number, correct? That is correct, Your Honor. I thought you answered. Go ahead. We think the court fundamentally erred on the issue of additional profits. The appellant had moved for summary judgment on that issue to preclude Mr. Leonard from providing any evidence of additional profits under 17 U.S.C. 504B. The magistrate heard oral argument. Instead of using the reasonable jury standard, which is the proper standard, he invented a new evidentiary standard and then recommended to the trial court that it grant the appellant's motion. Does this case bring an end to the issue of image infringement? I apologize, Judge Fuentes. I'm not sure I understand your question. You said something very interesting before, which is that they're still using the images, that is the distributors, that it's still going on. Yes, Your Honor. So I'm asking more about the question of Stemtech's control of its distributors with respect to these images. And you said they're still publishing the images, and I'm wondering, well, that sounds like Stemtech doesn't have very much control over its distributors. There are two types of infringements that are going on. You had what this case is primarily about are situations where you had Stemtech websites, Stemtech creating DVDs and other marketing material that they themselves created and then required their distributors to use. The infringements that are – Is that the past or is that what's currently going on? That's this – what I just said is this case. Right. The case in the Western District of Pennsylvania, appellant's position at least is, hey, look, we provide the website and they're just adding this stuff and this isn't any stuff that we've provided them and it's not sanctioned. Now, it's relevant to both this case and that case. There's plenty of testimony that, one, this is amazing to me. Appellants have never just simply sent a letter saying, hey, look, don't infringe on these images. Every time they've told the distributor not to infringe, the distributor has stopped. And that was evidence that the jury heard. They control – the reason everyone's doing this is to make money, which goes to the additional profits argument. The testimony is that they can just stop paying their distributors a paycheck. That's a pretty good incentive to get them to stop. They can shut down their websites, especially the websites we're talking about in this case. So control, as the trial court found on his decision denying the motion for a new trial, there was more than sufficient evidence. So what you're suggesting is that they have not altered their behavior with respect to controlling the distributors in regard to these images? Yes. They haven't done what a reasonable person would have done. I'm not sure that is an issue before this honor, but it is an overlying issue that I do think should concern this court. Is it a case that the distributors are simply recalcitrant, don't just do whatever they want? They have the images. They have access. They have the images. They can just use them, republish them at will. Judge Frantes, I see I'm out of time. Could I just have a little time to answer that? Yes, please. Your Honor, 100%. Every time Stemtech tells one of their distributors to stop, at least in this case, they immediately stopped. This is a case of not telling them because you want them to continue to sell product because that's how you make money. And that is part of why I think that the trial court fundamentally erred when it granted summary judgment and deprived Mr. Leonard of the opportunity to provide additional profit. So it had the wrong standard. And even under that standard, we had an admission from one of their officers saying, yes, if you're going to talk about stem cells, you need to sell a stem cell. If I understand you correctly, Stemtech tells its distributors to stop republishing the images. They do that. So is it the case that Stemtech is doing what it's supposed to do? No, Your Honor. Mr. Leonard would complain and say, hey, look, I found this infringement. He would send a letter to that particular distributor, it would stop, or he would tell Stemtech after he tried to do it, and Stemtech would tell them, and then they would stop. What Stemtech has never done, and again, I find this absolutely amazing, is simply told all their distributors, do not use any of these images. Some of these images in this case are still, you can find on the Internet. And there's never been a distributor-wide edict from the appellant saying, do not infringe on these images. Your Honor, the jury decision in this case was more than reasonable. We should have been allowed an opportunity to provide evidence on additional profits. That law is there for a reason I submit to Your Honor. This is exactly the type of case that reason is there. All right, Mr. Barrage, we're not going to get you back, so I think you should address that control issue for a minute or so. Thank you. Okay, thank you. Let me get Ms. Carter back. Thank you, Your Honors. I wanted to briefly return and finish responding to a question Judge Schwartz had asked, or maybe more appropriately, a comment about how these hypothetical licensing fees have been found to be appropriate measures of fair market value. I think the cases specifically on Davis and Oracle that have made that finding are distinguishable and a little more narrow than just any hypothetical license fee. On Davis, talked about, first of all, both on Davis and Oracle involved a claim by an author for which there was no actual history to be used. And in that instance, those courts found that using an actual licensing history of a similar author and similar works would be appropriate, not a fully hypothetical quotes on the Internet, but to actually take similar images by a similar author and see what a willing buyer paid. And that is not the measure that Professor Sedlick used in this case. Second, I wanted to turn back to the issue of control, if I might, and address that a little bit. The claim in the Western District of Pennsylvania actually involves secondary infringement claims against my client where a distributor shared on his own third-party website an article written by an author on a topic related to stem cells. Share if you like my article. So the distributor clicked share, and that article came up on his website to be shared, and that article allegedly included an unlicensed use of one of Mr. Leonard's images. In response to Mr. Leonard's contact to that distributor, Mr. Morris, who was also a defendant in that case, he immediately took that down, and it cannot be found any longer on his website. And StemTech requested it be taken down, but by the time we did that, it was already down. Could you address Mr. Erlage's statement that when StemTech says to its distributor, stop using those images, they stop using those images? So on that front, I think that it is fair to say that in most instances when my client goes to distributors that we have learned generally through Mr. Leonard are using what he tells us is an unlicensed image, that they very quickly are willing to take it down. It is the case that StemTech gave the images to the distributor, is it not? No, that is not the case, and that was one of the things that I wanted to talk about. Like I said in the Western District of Pennsylvania case, that is an image that was in an article written by an author unrelated to StemTech or the distributor that the distributor read online. Well, the jury made that determination. In this case? In this case, yes. It determined that you, StemTech, gave the images or gave permission to use the images to the distributors. Am I mistaken about that? I believe you are, Your Honor.  Well, the jury had in front of it evidence that all the materials they needed to become distributors had to be StemTech-supplied materials, and these StemTech-supplied materials, like the DVD and other materials, had the image. That is what the trial record suggests, in fact says. So are we mistaken? Yes, Your Honor, I believe you are mistaken. Then what is the evidentiary basis to say StemTech did not supply the distributors the images that were then displayed? So there are two different things that were going on in the trial court, and one is the direct infringement claims against StemTech, where we admitted to having exceeded our license on, I believe it was five uses. We are talking only about the distributors' use on the secondary theories of liability. Right. So what you are seeing, if you are looking at Exhibits 51 to 143, which are the alleged secondary claims, you are only seeing two things in those exhibits. One is you are seeing some replicated websites where the distributor is on one of StemTech's replicated websites, so you go to that website and it points you at the StemTech website. So that video is the direct infringement. It is actually the direct infringement, not a secondary infringement. That distributor didn't copy, didn't download, nothing volitional was proven about that use. That is actually the direct infringement. The other claims that you are seeing are uses, and those exhibits are secondary uses on secondary sites, and there is no evidence that those distributors obtained the image from us. Well, the jury had evidence from which an inference could be drawn, and apropos to what my colleague has been talking about, how can we disturb that reasonable inference from the evidence that the distributors received those materials through StemTech? Wasn't there sufficient evidence under the very deferential standard we must apply? Isn't that what the jury responded in the verdict sheet? No, there is a void of evidence that those images came from StemTech. There is no evidence to take any one of the 51 through 143 and show me that that distributor got a single piece of marketing material from us. I'm kind of surprised you started with damages in this case instead of liability, because if you have one on liability, the case is over. But now you are arguing that StemTech had no control. It seems like you started backwards with me. I didn't start backwards. I thought I would get there. I should have known. Experience shows I may never get to the end. One question on this prejudgment interest issue. Counsel is arguing that there is no discretion with respect to the prejudgment interest. Do you have any authority to the contrary? Yes, Your Honor. I just found the case. I'm sorry. I believe we cited authority that it is within the court's discretion, and I think the other comment I would add to that, which I didn't make earlier, is that one of our arguments was that Judge Stark didn't have the information he needed to actually calculate the interest because of the complexity of that calculation, which was another reason, I think, that formed the basis of his denial. And my colleague over there is calling that case back up because I didn't write it down. It's in the brief. I'll find it. Okay. It's in the brief, Your Honor. All right, Ms. Carter. Thank you very much. Thank you very much, Your Honors. Thank you and Mr. Berlage for your arguments. Very well presented case. Thank you, Your Honor. Take the case under advisement. Thank you both, and we'll call the next case.